**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOHN ORR, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:08-CV-953 (JCH) |
| v. | : | |
| | : | |
| SCOTT WISNER, ET AL., | : | JUNE 28, 2010 |
| Defendants. | : | |

**RULING RE: MOTION FOR SUMMARY JUDGMENT (Doc. No. 48)**

**I.      INTRODUCTION**

On June 25, 2008, John Orr ("Orr") initiated this lawsuit against Scott Wisner, J.

Paul Kenefick, Stephen Castagliuolo, William H. Telford, III, John Mesham, and Mark

Maynard (collectively, "the defendants"), alleging civil rights violations under 42 U.S.C.

§§ 1983 and 1985 ("section 1983" and "section 1985," respectively).  Orr, who was

formerly employed as a Constable by the Towns of Essex and Lebanon, Connecticut,

alleges that the defendants, current and former members of the Connecticut State

Police ("CSP"), conspired and retaliated against him because he arrested the nephew

of a former CSP captain.  Orr's Complaint contains three counts: Count One alleges a

denial of procedural due process; Count Two alleges a deprivation of liberty without due

process; and Count Three alleges a violation of section 1985.

The defendants have moved the court for summary judgment in their favor.  For

the reasons stated below, the Motion for Summary Judgment (Doc. No. 48) is granted.

## II.   FACTUAL BACKGROUND[1]

### A.   Orr's Roles as Constable

In June 2000, Orr was hired by the Town of Essex as a Constable.  Affidavit of John Orr at ¶ 4 (hereinafter "Orr Aff.").  In October 2003, he was hired in a similar role by the Town of Lebanon.  Id.  A Constable is, in essence, a police officer for a town that does not have its own police department.  See Memorandum in Opposition to Motion for Summary Judgment at 1 (hereinafter "Mem. in Opp.").  While Constables are employed by individual towns, L.R. 56(a)(1) at ¶ 1, they are supervised by members of the CSP, who are employed by the State of Connecticut.  Orr Aff. at ¶ 5.  Constables are not state employees, but they are simultaneously subject to "[t]own personnel procedures" and state police procedures.  L.R. 56(a)(1) at ¶ 5.  Prior to July 2005, Wisner and Maynard served as CSP "Resident Troopers" in Essex and Lebanon, respectively.  Id.  As Resident Troopers, Wisner and Maynard supervised Orr, id. at ¶ 6, and reported to the Essex and Lebanon First Selectmen on a variety of issues regarding Orr and other constables.  Id. at ¶ 3.

### B.   The Arrest of Matthew Sweetman

At approximately 1:22 a.m. on March 20, 2005, Orr arrested Matthew Sweetman, the nephew of a former captain in the CSP, for Driving Under the Influence (hereinafter "the Sweetman arrest").  L.R. 56(a)(1) at ¶¶ 29-30.  Orr then "transported [Sweetman] to the CSP Troop F barracks for processing."  Orr Aff. at ¶ 9.  As the arrest was being

---

[1]   For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving plaintiff, where there is evidence to support his allegations.

"processed," Orr was informed by the desk officer on duty, Trooper Perry, that the duty

sergeant, Sergeant McCarthy,[2] wanted Orr "to stop processing the arrest until Captain

Sweetman [Matthew Sweetman's uncle] arrived." Id.  Orr perceived this request as

"unusual, as [he] never before had been asked to stop processing an arrest to allow a

relative to come to the barracks to speak with an arrestee." Id. at ¶ 11.  Orr also

believed that a delay in processing the Sweetman arrest might "jeopardize[] the validity

of the arrest," due to the dissipation of alcohol from Matthew Sweetman's bloodstream.

Id. at ¶ 12.

Captain Sweetman arrived at the Troop F barracks at approximately 2:00 a.m.

on the night of the arrest. Id. at ¶ 13.  While Orr was not explicitly told not to proceed

with the Sweetman arrest, Orr alleges that he received a "clear impression" to that

effect from Captain Sweetman, as well as from Sergeant McCarthy and Trooper Perry.

Id. at ¶ 14.

C.      The Aftermath of the Arrest

Approximately one week later, an unnamed CSP Trooper told Orr, "I wouldn't

have made that arrest."[3] Id. at ¶ 15.  Thereafter, Orr was subjected to various acts by

the defendants which he characterizes as retaliatory.[4]  Some of those are described

---

[2] Neither Perry nor McCarthy is a party to this case.

[3] According to Orr, this statement was "clearly" in reference to the Sweetman arrest.  Orr Aff. at ¶ 15.

[4]  All of the defendants in this case, with the exception of Mesham, testified that they knew Captain Sweetman.  Mesham testified that he knew of Captain Sweetman, but had never worked with him and was unsure whether he had personally met him.  Deposition of John Mesham at 7:19-21.
Wisner worked with Sweetman in Troop F around 1992.  Deposition of Scott Wisner at 7:23-25. In addition, he stated that he has crossed paths with Sweetman "over the years." Id. at 8:1-3.  Early in his career, Maynard worked with Sweetman in Troop K.  Deposition of Mark Marnard at 7:16-21.  Maynard described Sweetman as a "casual acquaintance." Id. at 7:24.  Kenefick, who began working for the CSP

herein.

To begin, Orr alleges that he was essentially ostracized by CSP members at work, who, after the Sweetman arrest, failed to provide needed assistance to Orr during his daily work as a Constable. Beginning in April 2005, "dispatchers at both Troop F and Troop K barracks failed to respond to [Orr] on the radio and/or enter events called in by [him] into the computer system." Orr Aff. at ¶ 19. On June 12, 2005, dispatchers did not "assign a back-up to [him] when [he] was dispached to respond to a 911 hang-up call, in violation of Troop policy." Id. at ¶ 20.

On June 15, 2005, Wisner accused Orr of inappropriately interfering with a criminal investigation. Id. at ¶ 22. The following day, Orr received from Telford a disciplinary memorandum regarding Orr's practice of photographing and thumb-printing subjects of traffic stops, despite the fact that Wisner and Maynard "had long been aware of this practice, and one or both of them had provided [Orr] with a Polaroid camera, film and an ink pad in order to permit [him] to do so." Id. at ¶ 24, 25. Also in June 2005, Wisner "spoke to Orr about the inappropriateness of Orr involving himself in . . . Wisner's criminal investigations without authority to do so." L.R. 56(a)(1) at ¶ 56. On July 3, 2005, Wisner and Castaglioulo filed a complaint against Orr for, inter alia, racial profiling, "mishandling cases," "failing to make arrests," and photographing and thumb-printing subjects of traffic stops. Orr Aff. at ¶ 32. Orr denies such misconduct.

While, as described below, Orr's employment in Essex ended in August 2005, he

---

in 1990, worked with Captain Sweetman in Troop F in the first few years of his career. Deposition of J. Paul Kenefick at 7:21-8:18. Telford worked with Captain Sweetman "when [Telford] was assigned to Troop F as a patrol trooper, and [Captain Sweetman] was a resident trooper in the town of Killingworth." Deposition of William Telford at 7:19-24. Castagliuolo worked with Sweetman for approximately two years at a police training academy. Deposition of Stephen Castaliuolo at 8:3-18.

alleges that retaliatory acts against him continued after that date.  On September 24, 2005, Mesham responded to a call regarding a drunk driver near Orr's house.  Id. at ¶ 45.  The driver had "pulled into [Orr's] private driveway, then backed across the road and gotten stuck on land owned by the Essex Land Trust."  Id.  Orr alleges that Mesham "refused to take any action," leaving the drunk driver with Orr's wife, Joy, and their neighbor.  Id. at ¶ 46.  On November 10, 2005, Telford "pulled over behind [Joy Orr] on the shoulder of Route 9, where she was pulled over with a flat tire."  Id. at ¶ 48.  Telford and Joy Orr then proceeded to argue.  Id. at ¶ 49.  Orr alleges that Telford pointed his finger in Joy Orr's face and threatened her.  L.R. 56(a)(2) at ¶ 121; Orr. Aff. at ¶ 49.  When Joy Orr attempted to file a complaint the next day regarding Telford's behavior, the "Master Sergeant on duty" refused to take it.  Orr. Aff. at ¶ 50.  Joy Orr "ultimately filed a written complaint against . . . Telford," but Orr alleges that the complaint, which was "turned over to . . . Costagliuolo for investigation," was rejected out of hand.  Id. at ¶ 52, 53.

> D.    Disciplinary Measures Taken Against Orr

> > 1.    Essex

In early July 2005, Essex First Selectman Phillip Miller "requested a copy" of Wisner's July 3, 2005 complaint against Orr, as well as a tape recording of a conversation in which Orr was alleged to have been verbally abusive to Wisner.  L.R. 56(a)(1) at ¶ 56A.  On July 7, 2005, Miller "notified Orr that he was being suspended from duty."  Id. at ¶ 58.  As Miller testified, "it appeared that there had been conduct which was questionable enough that [Miller] was advised by [the town's] labor counsel . . . that it would be appropriate to issue this suspension."  Deposition of Philip Miller at

29 (hereinafter "Miller Dep."). Later that month, Miller "requested that the CSP conduct an internal affairs investigation into the incidents described in Trooper Wisner's July 3, 2005 memo," as well as a subsequent allegation that Orr had improperly stored a loaded shotgun in the trunk of his police cruiser.[5] L.R. 56(a)(1) at ¶ 63, 63A. Orr alleges that Miller "conveyed the message" to Orr that "unless [Orr] resigned, an investigation would begin." Orr Aff. at ¶ 72(d). While Orr thereafter appealed his suspension, he ultimately resigned on August 26, 2005, "in order to avoid being terminated." L.R. 56(a)(1) at ¶ 76; L.R. 56(a)(2) at ¶ 70.

On September 23, 2005, Orr learned that Kenefick had been assigned by Costaglioulo to conduct an investigation into Orr's alleged misconduct as Essex Constable. Orr Aff. at ¶ 38. Orr alleges that the investigation "was contrary to CSP procedures, as [Orr] had already been disciplined by the Town of Essex for each instance of alleged misconduct prior to [his] resignation, and [he] had already resigned [his] position as Constable with the Town of Essex." Id. at ¶ 39. Orr alleges that Wisner made false statements to Kenefick as part of the investigation. Id. at ¶ 40. Additionally, Orr alleges that Kenefick breached CSP policy by failing to keep the investigation confidential. Id. at ¶ 41. Kenefick ultimately concluded his investigation by "sustaining the complaints against [Orr]," but without interviewing any civilian witnesses. Id. at ¶ 43. Apparently based on the results of the investigation, Miller concluded that "Orr was guilty of willful violation of a published rule or regulation." Miller Dep. at 33:11-16.

---

[5] Orr denies that he ever carried a loaded shotgun in his police cruiser. L.R. 56(a)(2) at ¶ 63A.

2.      Lebanon

Orr continued to serve as Constable in the Town of Lebanon past the end of his

employment in Essex.  L.R. 56(a)(1) at ¶ 80.  Indeed, Maynard, who was Orr's Resident

Trooper in Essex, "confirmed with [the] CSP and the Town of Lebanon that Orr's

employment issues in Essex did not preclude or [a]ffect his employment with the Town

of Lebanon."  Id. at ¶ 83.

In January 2006, however, Orr received word from a non-defendant officer that

the defendants "were planning to force [him] out of [his] position as Constable with the

Town of Lebanon."  Orr Aff. at ¶ 59.  In February 2006, "Maynard was subpoenaed to

attend a state Labor Board hearing about a grievance Orr had filed against the town of

Essex regarding his July 2005 suspension."  L.R. 56(a)(1) at ¶ 91.  There, Maynard

received "several citations and photographs of traffic stops in Lebanon conducted by

Orr that contained motorist thumb prints."  Id.  Maynard believed these documents

"were dated after Maynard had told Orr to stop the practice of thumb printing motorists."

Id.  Indeed, in April 2005, Maynard had sent a memorandum to Orr, warning him "to

stop his practice of taking roadside thumb prints."  Id. at ¶ 88.[6]

Sometime thereafter, Maynard shared with Lebanon First Selectman Joyce

Okonuk the information given to him at the hearing regarding Orr's alleged practice of

improperly taking thumb prints of stopped motorists.  Id. at ¶ 92.  "[B]ased entirely" on

the information provided by Maynard, Okonuk became concerned that Orr, "a Lebanon

---

[6] Orr appears to deny this allegation, but the evidence he cites do not contradict the fact that
Maynard sent him such a memorandum in April of 2005.  See L.R. 56(a)(2) at ¶ 88; Def's' Exh. 25
(memorandum).

officer[,] was invading a citizen's right to privacy by photographing motorists and that many of the drivers were Hispanic." L.R. 56(a)(2) at ¶ 93, L.R. 56(a)(1) at ¶ 93. Okonuk soon met with Orr and Maynard and, based on the information provided by Maynard, "told Orr that she was concerned that what he was doing was illegal and that she did not want him representing Lebanon." L.R. 56(a)(2) at ¶ 97; L.R. 56(a)(1) at ¶ 97. Following the meeting, Okonuk told Maynard "not to schedule Orr for work hours while she considered what to do." L.R. 56(a)(1) at ¶ 99. In her deposition, Okonuk characterized this as a decision to place Orr on "administrative leave." See Deposition of Joyce Okonuk at 37:2-6 (hereinafter "Okonuk Dep."). Orr apparently remained on leave until Okonuk's decision to terminate his employment. On March 9, 2006, Maynard told Orr that he would be fired if he did not resign by March 10, 2006. Orr Aff. at ¶ 65. Orr thereafter resigned. Id. at ¶ 66.

## III.    STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Fed R. Civ. P. 56(c); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to

summary judgment."  United Transp. Union v. National R.R. Passenger Corp., 588 F.3d

805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to

defeat the motion, "the party opposing summary judgment . . . must set forth 'specific

facts' demonstrating that there is 'a genuine issue for trial.' "  Wright v. Goord, 554 F.3d

255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine

issue' exists for summary judgment purposes where the evidence is such that a

reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau,

524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d

Cir.2007)); see also Havey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir.

2008) (stating that a non-moving party must point to more than a mere " 'scintilla' " of

evidence in order to defeat a motion for summary judgment) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 252 (1986)).

## IV.     DISCUSSION

### A.     Count Two: Deprivation of a Liberty Interest[7]

Count Two of the Complaint alleges that the defendants made "false and

disparaging remarks . . . that damaged Orr's reputation," in connection with his forced

resignation from his positions as Constable.  Complaint at ¶ 52.  A section 1983 claim

for deprivation of a liberty interest without due process of law is commonly known as a

"stigma-plus" claim.  See Velez v. Levy, 401 F.3d 75, 87 (2d Cir. 2005).  "Stigma plus" is

a theory rooted in the Supreme Court's decision in Paul v. Davis, 424 U.S. 693 (1976),

and "refers to a claim brought for injury to one's reputation (the stigma) coupled with the

---

[7] Because the parties address Count Two of the Complaint before addressing Count One, the court will do the same.

deprivation of some 'tangible interest' or property right (the plus), without adequate process." DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003) (citation omitted). To prevail on a stigma plus claim, a plaintiff must show "(1) the utterance of a statement about [him] that is injurious to [his] reputation, 'that is capable of being proved false, and that he or she claims is false,' and (2) 'some tangible and material state-imposed burden . . . in addition to the stigmatizing statement,' " Velez, 401 F.3d at 87 (citations omitted). Because stigma-plus is a subclass of procedural due process, a plaintiff must also demonstrate that he was not afforded adequate process in connection with the deprivation of his liberty interest. Segal v. City of New York, 459 F.3d 207, 213 (2d Cir. 2006).

The defendants' principal argument is that, because they lacked the ability to terminate Orr's employment or to provide pre-deprivation process, they cannot be liable for any failure of process that Orr may have suffered. Orr maintains that disputed issues of material fact remain as to whether the defendants had the ability to provide him with due process. He also contends that, even if the defendants technically lacked the ability to terminate his employment (that is, to impose a "plus") or to provide him with process, summary judgment must be denied because they played an integral role in forcing him to resign from his positions as Constable.

Both sides rely extensively on Velez v. Levy, 401 F.3d 75 (2d Cir. 2005), in support of their positions. In Velez, a "community school board member" alleged that the defendants--the Chancellor, various school board members, and investigators-- "forced her removal from office," after "conspir[ing] to fabricate, and to disseminate publicly, accusations that she had sprinkled a powdery substance in front of the office

10

door of another school official."  Id. at 79.  She brought a stigma-plus claim, which was

dismissed by the district court pursuant to Fed. R. Civ. P. 12(b)(6).  The Second Circuit

affirmed the district court's dismissal of the stigma-plus claim as to all of the defendants

except the Chancellor.

As Orr emphasizes, the Velez court held that "perfect parity in the origin of both

the 'stigma' and the 'plus' is not required to state the infringement of a 'stigma-plus'

liberty interest."  401 F.3d at 89.  Indeed, Velez clarified that a stigma-plus claim need

not allege a "stigma" and a "plus" that were "imposed at precisely the same time."  Id.

Velez also cautions, however, that a stigma-plus claim cannot lie against an individual

who lacks the authority to provide process to the plaintiff.  As the court stated,

> [t]he existence of a liberty interest . . . is a very different question from that of
> whether both the originator of the stigma and the imposer of the plus are liable to
> the plaintiff.   And it is the case that, for any number of reasons . . . , one or more
> defendants whose actions collectively implicate a liberty interest may not be
> liable for the deprivation of that liberty interest.

Id. at 89 n.12.  The Velez court held that only the Chancellor could be liable to the

plaintiff on her stigma-plus claim, even though some of the other defendants were

responsible for stigmatizing statements, because only the Chancellor possessed the

power to impose a "plus" on the plaintiff, or to provide her with due process.  Id. at 93.

The other school board member defendants could not be liable because they lacked

"the power to provide process to the plaintiff.  They did not undertake or oversee the

investigation, and they could order neither pre-removal review nor post-removal

remedies."  Id. at 93.  Similarly, the investigator defendants could not be liable because

they "had no legal authority to bring about her ouster, for only Levy [the Chancellor] was

empowered to impose that 'plus.' "  Id.

In a similar matter, a district court in the Southern District of New York considered the case of a former employee of the New York Metropolitan Transit Authority ("MTA"), who, after being fired, filed a civil rights lawsuit against various MTA officials. Anemone v. Metropolitan Transp. Authority, 410 F. Supp. 2d 255, 263, (S.D.N.Y. 2006). The plaintiff, who had formerly served as "Deputy Executive Director of Security" for the MTA, had been investigating possible corruption among MTA officials and construction contractors. Id. at 262. His lawsuit alleged that, amid heavy public scrutiny, MTA officials attempted to impede the investigation by firing him. Id. at 262. One of the defendants in the Anemone case was Matthew D. Sansverie ("Sansverie"), who headed the office of the MTA Inspector General. The plaintiff alleged that Sansverie defamed him on two occasions. First, Sansverie sent an "Interim Report" to the MTA chairman, Peter S. Kalikow, recommending that the plaintiff be suspended from his position, which Report the plaintiff alleged was rife with "factual misrepresentations" and "unfounded accusations." Id. at 263. The following month, Sansverie sent Kalikow a letter that contained more of what the plaintiff alleged was false and distorted information. Id. The plaintiff was fired several weeks thereafter, and both the Interim Report and the subsequent letter to Kalikow became the basis for his stigma-plus claim against Sansverie.

Relying on Velez, the Anemone court dismissed the stigma-plus claim against Sansverie for failing to state a claim. The court noted that both the Interim Report and Sansverie's subsequent letter to Kalikow constituted a "stigma," and that the plaintiff's subsequent firing constituted a "plus." However, the court held that Sansverie was "not alleged to have imposed the 'plus' of termination, nor [was] he alleged to have had any

12

role in shaping or authority to shape the process Anemone was provided before he was fired." Id. at 270. Indeed, the court emphasized that Sansverie's role was limited "to investigating abuse and recommending remedial action" and did not include "adjudicating [the plaintiff's] employment status." Id. Citing Velez, the district court held that, in a situation in which "a particular defendant lacks the power to provide process to the plaintiff in connection with the liberty deprivation," that defendant cannot be liable, even if that defendant's actions, along with the actions of others, collectively implicate a liberty interest. Id. at 269.

The court concludes that this case is indistinguishable from Velez and Anemone. There is no disputed issue of material fact in this case that the First Selectmen of Essex and Lebanon--not the defendants or any other member of the CSP--had the "ultimate authority" to discipline Orr and to provide him with process. See L.R. 56(a)(2) at ¶ 59, 60. As Orr himself admitted in his deposition, any disciplinary actions against him, in his position as Constable, would "ha[ve] to come through the town;" indeed, no discipline could be imposed if the town "cho[se] not to act." Deposition of John Orr at 74:24-75:4 (hereinafter "Orr Dep."); see also Miller Dep. at 69:19-22 ("Q. If there were issues about discipline or other things relating to this contract, that would be handled by the Town of Essex; is that correct? A. Yes, sir."); Okonuk Dep. at 63:13-19 ("Q. Because, as I understand it, only the town – all of the constables were town employees, correct? A. Yes. Q. So only the town could take disciplinary action against them? A. Yes."). Consistent with this fact, it was the Town of Essex, rather than the CSP or any of the defendants, that notified Orr that he had been placed on paid leave in August 2005. L.R 56(a)(1) at ¶ 68. Similarly, it was Okonuk, rather than Maynard or any other

13

defendant, who placed Orr on administrative leave, and gave him the option to resign instead of "outright terminating him." See Okonuk Dep. at 39:5-11; 48:4-17.

Orr seeks to distinguish Velez and Anemone on the basis that the defendants were solely responsible for his day-to-day supervision, and that they were delegated the task of investigating his misconduct. He also stresses that the decisions made by Miller and Okonuk to terminate his employment were exclusively based on information that they had been provided by the defendants. While there is ample evidence in the record to support these factual assertions, see, e.g., Orr Aff. at ¶ 5; Miller Dep. at 33:11-16; Okonuk Dep. at 34:7-11, such assertions do not serve to distinguish Velez and Anemone from the instant case. Both Velez and Anemone clearly indicate that a close supervisory relationship--including one in which the supervisor has the ability to make disciplinary recommendations--is insufficient to support a stigma-plus claim, when the supervising defendants had no authority to impose a "plus" or to provide a defendant with process. Velez, 401 F.3d at 93; Anemone, 410 F. Supp. 2d at 269-70. Like Sansverie, whose role with respect to the Anemone plaintiff was "limit[ed] . . . to investigating abuse and recommending remedial action," 410 F. Supp. 2d at 269, the defendants in this case were responsible for supervising Orr, investigating his misconduct, and making recommendations to the First Selectmen of Essex and Lebanon. L.R. 56(a)(1) at ¶ 2-5. Like the school board defendants in Velez, none of the defendants in this case "had the power to provide process to the plaintiff. They did not undertake or oversee the investigation, and they could order neither pre-removal review nor post-removal remedies." Velez, 401 F.3d at 93. And like the investigator defendants in Velez, even if the defendants in this case acted "in concert" with the First

14

Selectmen of Essex and Lebanon "in effecting [Orr's] removal from office," they "had no

legal authority to bring about [his] ouster, for only [the First Selectman] was empowered

to impose that 'plus.' " Id.  While the record clearly supports Orr's contention that the

defendants worked closely with the First Selectmen, there is no dispute that they lacked

the ultimate authority to impose a "plus."[8]

In sum, the defendants' actions that provide the basis for Orr's stigma-plus claim

--which consist largely of making recommendations to First Selectmen Miller and

Okonuk that Orr be suspended or fired based on false factual assertions--go to the

"stigma" element of Count Two, rather than the "plus" element.  However, as Velez

makes clear, a stigma-plus action cannot lie against a defendant who has no ability to

impose a plus, or to provide process to the plaintiff.  Summary judgment is therefore

granted to the defendants on Count Two of the Complaint.

B.     Count One: Deprivation of a Property Interest

Count One of the Complaint, which alleges a deprivation of a property interest

without due process of law, is what is commonly called a procedural due process claim.

While, as stated above, an unconstitutional deprivation of a liberty interest is commonly

called a "stigma-plus" claim, "stigma plus is a species within the phylum of procedural

due process claims."  Segal, 459 F.3d at 213.  Consistent with this fact, the principles

articulated in Velez--regarding whether a defendant who lacks the ability to deprive the

plaintiff of a constitutionally-protected interest can be held liable for a failure of due

---

[8] With respect to Orr's employment as a Constable in Essex, Orr's employment was governed by the terms of an agreement between the Town of Essex and the Essex Police Union.  See Defs' Exh. 30. Under the terms of the contract, no Resident Trooper or other member of the CSP has the authority discipline Orr.  Id. at § 15.6.

process--apply to both Count One and Count Two.  While Orr may well have had a

constitutionally protected property interest in his position as Constable, there is no

evidence in the record on which a reasonable jury could find that the defendants had

authority to deprive Orr of that interest by firing, suspending, or otherwise disciplining

him.  The court therefore grants summary judgment on Count One of the Complaint on

the same basis on which it has granted summary judgment on Count Two.

> C.      Section 1985

Count Three of the Complaint alleges a violation of 42 U.S.C. § 1985(3) ("section

1985(3)").  Section 1985(3) states, in relevant part:

> If two or more persons in any State or Territory conspire . . . for the purpose of
> depriving, either directly or indirectly, any person or class of persons of the equal
> protection of the laws, or of equal privileges and immunities under the laws . . .
> the party so injured or deprived may have an action for the recovery of damages
> occasioned by such injury or deprivation, against any one or more of the
> conspirators.

Orr alleges that the defendants "conspired to deprive [him] by force, intimidation and

threats of his rights as a citizen."  Complaint at ¶ 56.  As evidence of such conspiracy,

Orr points to various actions undertaken by the defendants, including, inter alia,

conducting a deficient investigation into Orr's alleged misconduct as Constable,

"le[aving] a drunk driver alone with . . . Orr's wife and neighbor," stranding Orr's wife

and child "abandoned on the side of the road," and making false statements about Orr.

See Mem. in Opp. at 22.

To prevail on a claim under section 1985(3), a plaintiff must establish "(1) a

conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or

class of persons of the equal protection of the laws, or of equal privileges and

immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."  Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 791 (2d Cir. 2007).  The conspiracy that is the basis for the claim "must . . . be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.' "  Thomas v. Roach, 165 F.3d 137, 146 (2d Cir.1999) (quoting Mian v. Donaldson, Lufkin & Jenrette Secs. Corp., 7 F.3d 1085, 1088 (2d Cir.1993)). The defendants argue that the record is devoid of evidence that the conspiracy Orr alleges was motivated by racial or otherwise class-based discriminatory animus.  The court agrees.

To begin, there is no suggestion in the record that the conspiracy Orr alleges was motivated by racial animus.  Therefore, the court must consider whether there is evidence of a conspiracy motivated by animus that is "otherwise class-based."  To prevail on a section 1985(3) claim that alleges a conspiracy motivated by "class-based discriminatory animus," a federal court must consider whether the "class" at issue in fact constitutes a "class," rather than merely a group of individuals "seeking to engage in the activity the defendant has interfered with."  Town of West Hartford v. Operation Rescue, 991 F.2d 1039, 1046 (2d Cir. 1993); see also Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 269 (1993) ("Whatever may be the precise meaning of a "class" for purposes of Griffin's speculative extension of § 1985(3) beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors."); United Brotherhood of Carpenters and Joiners of America, Local 610, AFL-CIO v. Scott, 463

17

U.S. 825, 850 (1983) ("[T]he class must exist independently of the defendants' actions;

that is, it cannot be defined simply as the group of victims of the tortious action.")

(Blackmun, J., dissenting).  While the exact parameters of what constitutes a "class" are

less than clear, the Supreme Court has generally cautioned against  "interpreting §

1985(3) as a general federal tort law."  Griffin v. Breckenridge, 403 U.S. 88, 102 (1971).

Along these lines, section 1985(3) provides a cause of action against conspiracies

motivated by animus towards, inter alia, particular religions, Jews for Jesus, Inc. v.

Jewish Cmty. Relations Council of N.Y., Inc.,  968 F.2d 286, 291 (2d Cir.1992), and

political parties.  Keating v. Carey, 706 F.2d 377, 379 (2d Cir.1983), but "does not

protect against discrimination on the basis of economic or commercial animus, mere

political disagreement, or leadership in employment."  Nixon v. Blumenthal, 2010 WL

918091, at *6 n.3 (D. Conn. Mar. 11, 2010) (collecting cases).

The court is unable to determine what "class," if any, might be at issue in this

case.[9]  Having reviewed the pleadings, briefs, and evidence, the court cannot find a

single reference to the class that Orr believes was the target of the alleged conspiracy

comprised of the defendants.  Even if Orr's Memorandum in Opposition to the Motion

for Summary Judgment describes, with citations to the record, what a reasonable jury

might find constitutes an agreement among the defendants to harm Orr, the

Memorandum sheds no light on any evidence that the agreement was based on any

---

[9] Orr has not suggested that a "class of one" analysis should apply to his section 1985(3) claim. Even if Orr did make such an argument, however, "[t]he emerging consensus among federal authority . . . falls against the 'class of one' theory in the § 1985(3) context." Robinson v. Allstate, --- F. Supp. 2d ----, 2010 WL 1404023 (W.D.N.Y. 2010) (internal quotation marks and citation omitted); see also Chance v. Reed, 538 F. Supp. 2d 500, 509 (D. Conn. 2008) ("The 'class of one' theory is insufficient to form the basis for a § 1985 action.").

"class-based animus," and the court can find none.  The Motion for Summary Judgment

is therefore granted as to the section 1985(3) claim.

## IV.    CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment (Doc. No. 48) is

**GRANTED**.


**SO ORDERED.**

Dated at Bridgeport, Connecticut this 28th day of June, 2010.



           /s/ Janet C. Hall
           Janet C. Hall
           United States District Judge